**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EASTMAN KODAK COMPANY, *et al.*, | : | Case No. 12-10202 (ALG) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------- x

| | | |
|---|---|---|
| EASTMAN KODAK COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | Adv. Pro. No. 12-01720 (ALG) |
| | : | |
| APPLE INC. AND | : | |
| FLASHPOINT TECHNOLOGY, INC., | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------- x

## <u>MEMORANDUM OF OPINION</u>

A P P E A R A N C E S:

SULLIVAN & CROMWELL LLP
*Counsel to the Debtors*
  By:   Andrew G. Dietderich, Esq.
        Steven L. Holley, Esq.
        Brian D. Glueckstein, Esq.
        Michael H. Torkin, Esq.
125 Broad Street
New York, New York 10004

KIRKLAND & ELLIS LLP
*Counsel to Apple Inc.*
  By:   James H.M. Sprayregen, P.C.
        Gregory S. Arovas, P.C.
        Paul M. Basta, P.C.
        Brian S. Lennon, Esq.
601 Lexington Avenue
New York, New York 10022

- and -

By:   David R. Seligman, P.C.
      Marcus E. Sernel, P.C.
300 North LaSalle
Chicago, Illinois 60654

PEPPER HAMILTON LLP
*Counsel to FlashPoint Technology, Inc.*
  By:   Deborah Kovsky-Apap, Esq.
Suite 1800
4000 Town Center
Southfield, Michigan 48075

- and -

  By:   William D. Belanger, Esq.
        Todd A. Feinsmith, Esq.
        Lana A. Gladstein, Esq.
High Street Tower, 19th Floor
125 High Street
Boston, Massachusetts 02110

COLE, SCHOTZ, MEISEL, FORMAN,
& LEONARD, P.A.
*Co-Counsel to FlashPoint Technology, Inc.*
  By:   Michael D. Warner, Esq.
        Warren A. Usatine, Esq.
900 Third Avenue, 16th Floor
New York, New York 10022

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## <u>Introduction</u>

Before the Court is a motion for summary judgment filed by Eastman Kodak Company

("Kodak"), one of the debtors in the above-captioned bankruptcy case, on its claims for

declaratory and injunctive relief against Apple Inc. ("Apple") and FlashPoint Technology, Inc.

("FlashPoint").   Apple and FlashPoint have asserted inventorship claims pursuant to federal

patent law and state law claims relating to certain patents registered to Kodak.  Kodak contends

that Apple and FlashPoint were on notice of Kodak's interests, but slept on their rights, and are

thus precluded from asserting claims under the doctrine of laches and applicable statutes of limitations. For the reasons set forth below, Kodak's motion is granted in part and denied in part, without prejudice to renewal on a more complete record.

**Facts**

### I.     The Parties

On January 19, 2012, Kodak and certain of its affiliated companies (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. According to the declaration accompanying its petition, Kodak created the first digital camera and has invested billions of dollars in research and development of digital imaging technology over the years. *Declaration of Antoinette P. McCorvey* ¶ 8 (Jan. 18, 2012), ECF No. 2.

Defendant Apple is a global leader in the design and manufacture of digital consumer products and is among the largest, if not the largest, company in the world as measured by market capitalization. Apple was interested in the development of digital camera technology at least as far back as 1994, when Apple and Kodak collaborated with respect thereto. Defendant FlashPoint was created as the result of a spin off by Apple in 1996, when Apple assigned to FlashPoint all of its "right, title, and interest" in certain digital imaging technology, patent applications, and issued patents (the "Spin Off Assignment") as well as "the right to otherwise exercise all rights with respect thereto as Apple would have been permitted to exercise had this assignment not occurred." *Fry Declaration* ¶¶ 4, 7-9. The terms of the Spin Off Agreement provided that FlashPoint would succeed to Apple's business of "developing, marketing,

3

commercializing and licensing technology and products related to digital cameras and related

host systems." *Id.* ¶ 7, Ex. A, at p.1.

**II.    The Disputed Patents**

The inventorship and ownership of thirteen patents are in dispute.  Kodak is the owner of

record of each of the Disputed Patents as reflected in the records of the U.S. Patent and

Trademark Office ("USPTO").  *Lynch Declaration* ¶ 3.  Both Apple and FlashPoint claim

interests in ten of the following patents (the "Jointly Disputed Patents), and FlashPoint claims

interests in three additional patents (the "Additional Disputed Patents," and, together with the

Jointly Disputed Patents, the "Disputed Patents").

The Jointly Disputed Patents are:

(i)       U.S. Patent No. 5,493,335 (the "335 Patent"), entitled "Single Sensor Color

Camera with User Selectable Image Record Size," was issued on February 20, 1996;  names

Kenneth A. Parulski, Richard M. Vogel, and Seishi Ohmori as inventors; and lists Kodak as the

assignee of the patent.

(ii)      U.S. Patent No. 5,828,406 (the "406 Patent"), entitled "Electronic Camera Having

a Processor for Mapping Image Pixel Signals into Color Display Pixels," was issued on October

27, 1998; names Kenneth A. Parulski and Timothy J. Tredwell as inventors; and lists Kodak as

the assignee of the patent.

(iii)     U.S. Patent No. 6,147,703 (the "703 Patent"), entitled "Electronic Camera with

Image Review," was issued on November 14, 2000;  names Michael Eugene Miller and Richard

William Lourette as inventors; and lists Kodak as the assignee of the patent.

(iv)     U.S. Patent No. 6,292,218 (the "218 Patent"), entitled "Electronic Camera for

Initiating Capture of Still Images While Previewing Motion Images," was issued on September

4

18, 2001; names Kenneth A. Parulski and Timothy J. Tredwell as inventors; and lists Kodak as

the assignee of the patent.  The 218 Patent is a division of application No. 08/367,399, which

was filed on December 30, 1994.[1]

(v)    U.S. Patent No. 6,441,854 (the "854 Patent"), entitled "Electronic Camera with

Quick Review of Last Captured Image," was issued on August 27, 2002; names Richard William

Lourette, Michael Eugene Miller, Peter Fellegara, Linda M. Antos, and Robert H. Hibbard as

inventors; and lists Kodak as the assignee of the patent.  The application for the 854 Patent was

published on August 23, 2001.

(vi)    U.S. Patent No. 6,879,342 (the "342 Patent"), entitled "Electronic Camera with

Image Review," was issued on April 12, 2005; names Michael Eugene Miller and Richard

William Lourette as inventors; and lists Kodak as the assignee of the patent.  The 342 Patent is a

division of application No. 08/769,573, which was filed on December 19, 1996.

(vii)    U.S. Patent No. 7,210,161 (the "161 Patent"), entitled "Automatically

Transmitting Images from an Electronic Camera to a Service Provider Using a Network

Configuration File," was issued on April 24, 2007; names Kenneth A. Parulski, Joseph Ward,

and James D. Allen as inventors; and lists Kodak as the assignee of the patent.  The 161 Patent is

a continuation of application No. 09/004,046, which was filed on January 7, 1998.[2]

(viii)    U.S. Patent No. 7,453,605 (the "605 Patent"), entitled "Capturing Digital Images

To Be Transferred to an E-Mail Address," was issued on November 18, 2008; names Kenneth A.

Parulski, Joseph Ward, and Michael C. Hopwood as inventors; and lists Kodak as the assignee of

the patent.  The 605 Patent is a continuation of application No. 09/821,152, filed on March 29,

---

[1]  A later application for an independent invention carved out of a pending application and disclosing and
claiming only subject matter disclosed in the earlier application is known as a divisional application or "division."
   2 A continuation of an application is a patent application filed by an applicant who wants to pursue
additional claims to an invention disclosed in an earlier application of the applicant that has not yet been issued or
abandoned.

2001, which itself was a continuation of application No. 08/977,382, filed on November 24,

1994.

(ix)    U.S. Patent No. 7,742,084 (the "084 Patent"), entitled "Network Configuration

File for Automatically Transmitting Images From an Electronic Still Camera," was issued on

June 22, 2010; names Kenneth A. Parulski, Joseph Ward, and James D. Allen as inventors; and

lists Kodak as the assignee of the patent.  The 804 Patent is a continuation of application No.

09/783,437, filed on February 14, 2001, which was a division of application No. 09/004,046,

filed January 7, 1998.

(x)    U.S. Patent No. 7,936,391 (the "391 Patent"), entitled "Digital Camera with

Communications Interface for Selectively Transmitting Images Over a Cellular Phone Network

and a Wireless LAN Network to a Destination," was issued on May 3, 2011; names Kenneth A.

Parulski, Joseph Ward, and James D. Allen as inventors; and lists Kodak as the assignee of the

patent.  The 391 Patent is a continuation of application No. 11/692,224, filed on March 28, 2007,

which itself was a continuation of application No. 09/783,437, filed February 14, 2001, which in

turn was a division of application No. 09/004,046, filed January 7, 1998.

The Additional Disputed Patents are:

(i)    U.S. Patent No. 6,288,743 (the "743 Patent"), entitled "Electronic Camera for

Processing Image Segments," was issued on September 11, 2001; names George E. Lathrop as

inventor; and lists Kodak as the assignee of the patent.

(ii)    U.S. Patent No. 6,542,192 (the "192 Patent"), entitled "Image Display Method

and Digital Still Camera Providing Rapid Image Display by Displaying Low Resolution Image

Followed by High Resolution Image," was issued on April 1, 2003; names Hideki Akiyama and

Masaki Izumi as inventors; and lists Kodak as the assignee of the patent.  The application for the

192 Patent was published on May 31, 2001.

      (iii)     U.S. Patent No. 7,508,444 (the "444 Patent"), entitled "Electronic Camera with

Quick View and Quick Erase Features,"  was issued on March 24, 2009; names Thomas A.

Napoli, Masaki Izumi, Kyoicki Omata, Carolyn A. Bussi, and Clay A. Dunsmore as inventors;

and lists Kodak as the assignee of the patent.

## III.    Relationship Between Kodak and Apple

      Between 1992 and 1996, Apple enlisted Kodak to assist it in developing certain aspects

of digital cameras under the Apple project code names Adam, Aspen, and Phobos.  Internal

Kodak files establish that, in 1992, Apple had discussed developing "burst" technology for

digital cameras. Ex. 23 to Apple's Opposition to Summary Judgment, ECF No. 22.  On

November 24, 1992, Apple gave a presentation to Kodak entitled, "Adam Project Technical

Overview." *Ex. 31 to Apple's Opposition to Motion.*  On January 25, 1993, Eric Zarakov, a

project manager at Apple, sent a letter (the "Zarakov Letter") to David Lewis, a manager in

Kodak's computer camera products division. *Ex. 30 to Apple's Opposition to Motion.*  The

Zarakov Letter documents that Apple and Kodak representatives met in December 1992 to

discuss digital camera technology, including technical architecture associated with the Adam

project.  The discussions were also documented by internal Kodak research records.  Ex. 29 to

Apple's Opposition to Summary Judgment, ECF No. 22.

      In late 1992 and the first half of 1993, Scott Fullam, an Apple Employee, conducted

searches for Kodak digital camera patents relating to the following terms: Color Filter Array,

Signal Processing, Modular, Cobra Flash, Shutter, Full Frame, CCD, Charge Coupled Device,

Solid State Image Sensor, Electronic Shutter, Flash Illumination, auto, focus, iris, exposure, white balance, contrast, black level, or white level. *Exs. 19-21 to Holley Declaration*. In March 1994, Kodak made a presentation (the "1994 Presentation") to Apple addressing, among other things, Kodak's strengths in the digital imaging field, Kodak's view on the architecture of Apple's digital camera technology, and Kodak's proposals for possible alternative architectures related to the Aspen and Phobos Projects. *Ex. 16 to Holley Declaration*. There is no dispute that this presentation included a diagram similar to Figure 2 of the 218 Patent, nor is there any dispute that Kenneth A. Parulski, a named inventor of several of the Jointly Disputed Patents (including the 218 Patent), was part of the team that prepared the 1994 Presentation.

Later that year, on December 20, 1994, Kodak and Apple entered into an agreement (the "1994 Development Agreement") to share certain patents and other intellectual property in order to develop new camera products for Apple's Aspen and Phobos projects. The 1994 Development Agreement provided, among other things, that each party would retain ownership of its respective intellectual property utilized in developing the new camera technology. (¶ 5.) Further, the parties agreed that they could "modify, adapt, improve and make derivatives from" certain of the other party's intellectual property in connection with the projects, but that they would disclose to the other party if they did so and also irrevocably assign intellectual property rights in the resulting work, expressly including patent rights. (¶ 6.) In 1996, Kodak terminated the 1994 Development Agreement. (Apple's Opposition at 3.) Several of the Disputed Patents were applied for or issued during the time the 1994 Development Agreement was in effect.[3]

---

[3] FlashPoint's outside counsel has received a copy of the 1994 Development Agreement pursuant to a confidentiality agreement, but the terms of a confidentiality agreement prevent counsel from sharing the 1994 Development Agreement with FlashPoint.

Apple cited the 335 Patent as prior art in at least eleven of its own patents during the period from 1996 through 2002. *See Ex. 23 to Holley Declaration.* Apple claims that, although it owns the patents which refer to Kodak's as prior art, the patent prosecution process was undertaken by outside counsel. Apple denies that it was involved in reviewing or citing the 335 Patent in its applications and argues that this is consistent with normal industry practice. *Apple's 7056-1 Statement* ¶ 23.

## IV.   Relationship Between Kodak and FlashPoint

After Apple spun off FlashPoint in 1996, Kodak and FlashPoint entered into at least four licensing and development contracts related to digital camera technology between 1997 and 2003.

First, Kodak and FlashPoint entered in an agreement, effective as of January 1, 1997 (the "1997 Development Agreement"), pursuant to which FlashPoint agreed to provide software development services to Kodak in connection with Kodak's digital cameras. *FP 7056-1 Statement* at ¶ 20. The 1997 Development Agreement also set out the parameters governing the intellectual property rights retained by the respective parties during this collaboration, stating that, except as specifically noted to the contrary, FlashPoint would retain all right, title, and interest in the products that it developed. *Ex. B to Fry Declaration* at § 4.2.

Second, Kodak and FlashPoint entered into an agreement, effective as of March 17, 1997 (the "1997 License Agreement"), whereby FlashPoint agreed to develop and license to Kodak certain imaging software for digital cameras and computers. *Ex. C to Fry Declaration.* Among other things, Kodak agreed not to sue FlashPoint in any forum for infringement of any of Kodak's patents owned or obtained during the term of the 1997 License Agreement, subject to exceptions not relevant here. *Id.* §§ 9.1-9.3. This provision was to continue until the expiration

of the last such patent, and the covenant was to survive termination of the 1997 License

Agreement. *Id.* §§ 9.2, 11.2.   The term of the 1997 License Agreement was to extend to the

earliest of December 1, 2001; four years from the date on which Kodak shipped certain cameras;

or termination by the parties for cause. *Id.* § 10.

Next, Kodak and FlashPoint entered into an agreement, effective as of November 5, 1998

(the "1998 Development Agreement"), which stated that it "provides the general terms and

conditions for such software development services" as were contemplated by the 1997 License

Agreement. *Ex. D to Fry Declaration*, at 1.   Section 5 of the 1998 Development Agreement

further provided that "[e]ach party agrees not to use the other party's Confidential Information

for any purpose not expressly authorized by this Agreement."   The definition of "Confidential

Information" includes all of the software being licensed to Kodak. *Id.* § 1.4.   Moreover, section

6.1 stated that FlashPoint retained all ownership rights, title, and interest in the developed

products, unless explicitly specified to the contrary.   The 1998 Development Agreement

terminated by its terms on December 31, 2000, but the obligations under sections 5 and 6, among

others, survived termination. *Id.* §§ 7.1, 7.4.

Kodak and FlashPoint finally entered into an agreement, effective as of June 5, 2003 (the

"2003 Patent Agreement"), pursuant to which FlashPoint licensed to Kodak all of the patents

issued to or owned by FlashPoint as of the effective date and all patent applications, or patents

issued therefrom, with an effective filing date on or prior to December 31, 2012. *Ex. E to Fry

Declaration*.   The 2003 Patent Agreement stated that the 1997 License Agreement "has

previously terminated and/or has expired pursuant to its terms" and that each of the parties

"forever releases, discharges and waives any claims that it may have, known or unknown,

against the other party [under the 1997 License Agreement]." *Id.* § 2.3.4.   The 2003 Patent

10

Agreement further contained a broadly worded release and covenant by FlashPoint not to sue Kodak in connection with any of the licensed patents; patent applications; and related, subsequently issued patents. *Id.* § 2.4.

In June 2003, Kodak retained Stan Fry, FlashPoint's president and CEO, as a consultant on its digital imaging licensing strategy. *FP 7056* ¶ 17. Fry has averred in connection with this motion that his retention was an accommodation to Kodak in connection with the 2003 Agreement and that he did not review any specific Kodak patents while he was so retained, and Kodak has not disputed this contention. *Fry Declaration* ¶¶ 23-26.

In August 2010, Kodak contacted FlashPoint in connection with its dispute with Apple over the 218 Patent (further discussed below), at which point FlashPoint says it realized that it might have inventorship and ownership claims to the 218 Patent as well. *Fry Declaration* ¶ 27-29. Accordingly, FlashPoint sought information and a standstill agreement from Kodak and Apple, which agreement (the "Standstill Agreement") was concluded on September 21, 2010. *Id.* at ¶ 29. The Standstill Agreement suspended any limitations period relating to Flashpoint's participation in the pending dispute between Kodak and Apple. There is a dispute as to when the Standstill Agreement terminated, but all parties agree that it continued until at least March 8, 2011.

FlashPoint, like Apple, has cited certain of the Jointly Disputed Patents as prior art in its own patents. These include citations to the 218 Patent, 335 Patent, 406 Patent, 703 Patent, and 854 Patent. *See Ex. 23 to Holley Declaration* (listing twenty-eight examples). FlashPoint disputes this fact only to the extent of denying that citations imply that FlashPoint had reasonable notice of Kodak's claims to the patents. *FlashPoint 7056-1 Statement* ¶ 24.

V.     **Kodak's Patent Strategy: Litigation and Licensing**

Beginning around 2001, Kodak formulated and carried out a strategy to increase revenue from its patent portfolio through infringement litigation and licensing. *Motion* at 7. Since 2004, Kodak has initiated ten patent infringement actions in federal district courts and three investigations before the U.S. International Trade Commission ("ITC") relating to seven of the Jointly Disputed Patents. *See Ex. F. to Lynch Declaration.* Kodak's litigation strategy was picked up in the national press, including, for example, a *New York Times* article dated March 10, 2004 that noted Kodak was suing Sony for infringing patents that "covered various aspects of capturing, storing and displaying both still and moving digital images." *Ex. 17 to Holley Declaration.* Kodak in fact filed the Sony lawsuit on March 4, 2004 in the Western District of New York against Sony Corp. and certain of its affiliates (the "Sony Litigation"), alleging infringement of a group of patents that included the 218 Patent and 335 Patent. In connection with the Sony Litigation, Sony issued Apple and FlashPoint discovery subpoenas on August 12, 2005 (the "Sony Subpoenas") requesting, among other things, documents related to Projects Adam, Phobos, and Aspen. *Exs. 22, 24 to Holley Declaration.* The subpoena served on FlashPoint explicitly made reference to the 218 Patent, the 335 Patent, and four parent patents related to the Jointly Disputed Patents. *Id.*; *FlashPoint 7056-1 Statement* ¶ 26. Both Apple and FlashPoint responded to the Sony Subpoenas.

Kodak has also openly licensed its digital imaging patents, issuing press releases like the one dated February 14, 2001, that described an agreement between Kodak and Olympus Optical Company, Ltd., a company involved in digital camera production. *Ex. 17 to Holley Declaration*; *see also Analyst Report attached as Ex. 27 to Holley Declaration* at 2 (noting this and two other announcements by Kodak relating to its licensing strategy).

VI.     **Prior Litigation Between Kodak and Apple**

On January 14, 2010, Kodak filed a request with the ITC to begin an investigation (the "ITC Proceedings") into whether certain Apple products violated the Tariff Act of 1930 by infringing Kodak's 218 Patent.  On the same day, Kodak also filed a complaint in the Western District of New York against Apple for infringement of the 218 Patent and the 335 Patent (the "W.D.N.Y. Action").

It is at this point, after Kodak sued it for infringement, that Apple says it began an extensive internal investigation into its digital camera development projects with Kodak in the 1990s and realized that Kodak had wrongfully obtained patents based on intellectual property disclosed by Apple during those collaborations.  (*California Complaint* ¶ 11.)  On August 25, 2010, Apple filed a complaint in the Superior Court of California (the "California Complaint") against Kodak seeking a declaratory judgment and damages based on Kodak's alleged breach of the 1994 Development Agreement by using Apple's technology to procure the 218 Patent, conversion, judgment that Apple was the rightful owner of the 218 Patent, unfair competition and business practices, and breach of fiduciary duty.  Certain of these claims were also asserted by Apple as defenses in the ITC Proceedings.  The California Complaint and ITC defenses constitute the first time Apple asserted formal claims relating to the 218 Patent.  *Apple 7056-1 Statement* ¶ 28.  After Kodak removed the California action to federal court and prevailed on a motion to transfer the California Complaint to the Western District of New York, Apple amended its answer in the W.D.N.Y. Action to include counterclaims, effectively transferring the substance of the California Complaint to that forum.

In the ITC Proceedings, FlashPoint produced in discovery a document entitled, "Kodak's Patents: Market Impact" (the "Analyst Report").  *Ex. 27 to Holley Declaration*.  The Analyst

Report, dated March 2001, stated that "Kodak has brought to the industry's attention that it holds key patents related to digital cameras as well as online imaging services . . . [that] pertain to most digital cameras available on the market today," and purported to "examine[] the recent announcements from Kodak, analyze[] the potential market impact of Kodak's digital camera patents, and highlight[] potential strategies for digital camera manufacturers." *Id.* at 1.  The Analyst Report specifically mentions the 335 Patent as one of five "key digital camera-related patents," though none of the other Disputed Patents is listed specifically. *Id.* at 2-3.  The Analyst Report also indicates that FlashPoint's licensing relationship with Kodak, described above, was a potential shield to Kodak's new enforcement campaign, given the provisions in FlashPoint's standard licensing agreements barring suits against FlashPoint. *Id.* at 4-5.

Apple requested and obtained a stay of the W.D.N.Y. Action from the District Court pending a final decision in the ITC Proceeding.  After it amended its complaint in the W.D.N.Y. Action to include the assertions from the California Complaint, Apple unsuccessfully moved to lift that stay, which remains in effect.  The ITC Proceedings have continued and have resulted in a decision against Kodak on the infringement issue, finding that the 218 Patent is invalid for obviousness.[4]  This Court has also denied an earlier motion by Apple to lift the automatic bankruptcy stay with respect to the W.D.N.Y. Action, and the W.D.N.Y. Action remains stayed while proceedings have continued before the ITC and this Court on distinct issues.

---

[4] In the ITC Proceeding, on January 24, 2011, Administrative Law Judge (ALJ) Paul Luckern issued Final Initial and Recommended Determinations, in which he found that the patent was invalid for obviousness.  On June 30, 2011, the ITC reviewed ALJ Luckern's decision, and remanded the matter for further consideration, including a reexamination of the 2l8 Patent and an explanation of the secondary considerations of nonobviousness.  On May 21, 2012, ALJ Pender issued a remand initial determination reaffirming the finding of obviousness, and on July 20, 2012, the ITC affirmed. The ITC's determination is not binding in subsequent litigation.  *See Texas. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996) (findings of the ITC do not bind district courts).

VII.    **The Bankruptcy Case**

As noted above, Kodak and certain of its affiliates filed for chapter 11 protection on January 19, 2012. As a central part of its reorganization efforts, Kodak plans to sell over 1,000 digital imaging patents under § 363 of the Bankruptcy Code, including the thirteen Disputed Patents.

Apple appeared in this case on the first day, when it filed a limited objection to the Debtors' motion for debtor-in-possession financing, asserting that it was the true owner of the 218 Patent and "potentially other patents in Kodak's digital imaging portfolio." *See Limited Objection* at 2 (Jan. 19, 2012), ECF No. 40. This objection was consensually resolved by the addition of language in the DIP financing order clarifying that the DIP lenders would not take liens in property determined not to have been property of the estate at the time the order was entered. *See Interim DIP Order* at ¶ 7(d), ECF No. 54.

About a month later, Apple moved to lift the automatic stay to proceed with the W.D.N.Y. Action and transfer that action to the Southern District of New York, which motion was denied on the record at a March 8, 2012 hearing. Hr'g Tr. 60-63:20 (Mar. 8, 2012); *see also Motion for Relief from Stay* (Feb. 14, 2012), ECF No. 344. FlashPoint first appeared in this case at the March 8, 2012 hearing. Hr'g Tr. 38:20-21 (Mar. 8, 2012). At that point, FlashPoint claimed rights in the 218 Patent and argued that its rights were derivative of Apple's (presumably by way of the Spin Off Assignment). *FlashPoint Answer* ¶ 26 (June 22, 2012), Ex. A to ECF. 5; Hr'g Tr. 56:2-3 (June 13, 2012). Neither Apple nor FlashPoint had yet asserted claims against any of the Disputed Patents except the 218 Patent.

On March 16, 2012, Apple asserted ownership interests in the nine other Jointly Disputed Patents through a letter to Kodak's counsel. *Ex. 18 to Holley Declaration*, ECF No. 12. These

15

claims are repeated and expanded in the answer and counterclaims filed by Apple in this

adversary proceeding. *See Apple's Answer, Affirmative Defenses, and Counterclaims* (June 22,

2012), Ex. A to ECF No. 3. At a hearing on June 13, 2012, FlashPoint claimed it owned all ten

Jointly Disputed Patents as well as the three Additional Disputed Patents, but did not formally

assert interests any of the Disputed Patents until June 25, 2012, when FlashPoint filed its answer

and counterclaims in the adversary proceeding. *See Flashpoint's Answer, Affirmative Defenses,*

*Counterclaims, and Cross-Claims* (June 25, 2012), Ex. A to ECF No. 5.

Because of the California Complaint and W.D.N.Y. Action, Kodak was aware that Apple

had contested ownership in at least one of the Disputed Patents. Accordingly, almost a month

before filing its motion to establish sale procedures,[5] Kodak filed a motion in this Court "in aid

of an asset sale," requesting an order finding that Apple and FlashPoint had no ownership

interests in the Disputed Patents and authorizing a sale of the Disputed Patents free and clear of

any such claims. *Motion* (May 14, 2012), ECF No. 1184. Apple opposed the motion and filed a

motion in the District Court to withdraw the bankruptcy reference; FlashPoint also filed an

objection and joined in Apple's withdrawal motion. ECF Nos. 1300, 1312, 1331, 1334. The

Court denied Kodak's motion in a written decision, holding that Kodak would have to

commence an adversary proceeding to litigate the issues. *In re Eastman Kodak Co.*, 2012 WL

2255719 (Bankr. S.D.N.Y. June 15, 2012)..

## VIII.   The Adversary Proceeding

Kodak filed its adversary complaint on June 18, 2012, three days after the Court denied

its motion for an order in aid of sale. The adversary complaint seeks a declaratory judgment that

the Disputed Patents are property of the bankruptcy estate under 11 U.S.C. § 541 and that Kodak

---

[5] On June 11, 2012, Kodak filed its motion to establish procedures with respect to sale of the patent
portfolio, and, on July 5, 2012, the Court granted Kodak's motion and scheduled a final hearing on the sale for
August 20, 2012. *Order* (July 5, 2012), ECF No. 1590.

may sell the Disputed Patents under 11 U.S.C. § 363 free and clear of any interest asserted by

Apple or FlashPoint.  Kodak also requested injunctive relief against Apple and FlashPoint

barring them from interfering with the anticipated § 363 sale and asserting their ownership

claims under any theory.  *Adversary Complaint* ¶¶ 28-38, Adv. Pro. No. 12-01270, ECF No. 1.

    In response, Apple and FlashPoint filed answers and renewed their motions to withdraw

the bankruptcy reference.[6]  Apple asserts affirmative defenses that dispute the merits of Kodak's

case and assert that Kodak's conduct in failing to disclose the Jointly Disputed Patents to Apple

prohibits it from relying on the equitable doctrine of laches.  *Apple Answer* ¶¶ 39-40.  Apple

counterclaims also seek correction of inventorship of all ten Jointly Disputed Patents and allege

breach of the 1994 Development Agreement, conversion, unfair competition, deceptive business

acts, and breach of fiduciary duty.  *Id.* at ¶¶ 47-85.

    In its answering papers, FlashPoint generally objects to the relief sought by Kodak and

asserts numerous affirmative defenses and counterclaims similar to those filed by Apple.

FlashPoint argues that Apple or FlashPoint employees are the sole or joint inventors of the

Jointly Disputed Patents (Second and Third Affirmative Defenses), that FlashPoint did not

unreasonably delay assertion of, and had no knowledge or reason to know of, its ownership

claims (Fifth and Seventh Affirmative Defenses), that Kodak's own conduct prevents it from

arguing the claims are time barred (Sixth Affirmative Defense), and that FlashPoint's claims

were equitably tolled (Eighth Affirmative Defense).  *FlashPoint Answer* ¶¶ 42-13, 45-48.

FlashPoint also asserts counterclaims for a declaratory judgment that it owns each of the thirteen

Disputed Patents, and seeks damages for breach of contract, conversion, deceptive business acts,

---

[6] Apple and FlashPoint filed their answers in the District Court pursuant to Local Bankruptcy Rule 5011-1, which provides in part that, when a motion to withdraw is made, "[a]ll subsequent papers relating to the motion shall be filed with the Clerk of the District Court."  As indicated by the citations above, they have also filed these papers on the adversary proceeding docket as exhibits to their respective notices of commencement of a District Court case.

unfair competition, and breach of confidence by Kodak.  *Id.* ¶¶ 98-176.  FlashPoint also asserts

cross-claims against Apple, claiming that Apple has no standing to assert inventorship or

ownership claims since it assigned all such rights to FlashPoint.

Kodak filed the instant summary judgment motion on June 29, 2012, asserting that

Apple's and FlashPoint's inventorship claims are barred by the equitable doctrine of laches and

that their ownership claims, based on state law, are barred by applicable statutes of limitations.

Apple and FlashPoint have objected, arguing that they did not and could not have reasonably

known about their claims to the Disputed Patents before the applicable limitations and laches

periods ran, and that principles of equitable tolling and state law discovery rules have extended

the time periods.  They also argue that Kodak has not shown it was prejudiced by the delay in

bringing the inventorship claims, a required showing for the application of laches.

The Court heard oral argument on Kodak's motion on July 24, 2012.  On July 26, 2012,

the District Court denied the motion to withdraw the reference without prejudice so as to allow

this Court to render decision on this motion without interruption.  *Eastman Kodak Co. v. Apple

Inc.*, Case No. 12-CV-4881 (GBD), Dkt. No. 28.

## Discussion

### I.    Legal Standard

Summary judgment under Rule 56, made applicable by Bankruptcy Rule 7056, is proper

where "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir.

2005).  The moving party bears the burden of demonstrating the absence of any genuine issue of

material fact, and all inferences to be drawn from the underlying facts must be viewed in the

light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A fact is "material" if it might affect the outcome of the suit under the governing substantive law, and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.    Federal Inventorship Claims

Apple and Flashpoint assert two types of claims: inventorship claims and ownership claims. Inventorship claims seek in effect to correct the patent office record as to the inventor or joint inventor of an invention, and they arise under section 256 of the Federal Patent Act, 35 U.S.C. § 256. Ownership claims do not seek injunctive relief against the USPTO to change the registration of a patent, and rather than ownership per se, their principal goal is damages under state law for appropriation of property rights or related torts (such as breach of fiduciary duty claims). The parties agree that federal law controls the laches issues, while California law governs the state law issues. Kodak seeks summary judgment on the ground that the inventorship claims are subject to the equitable doctrine of laches and that the state law claims are barred by applicable statutes of limitations. We deal first with the laches defense to the defendants' inventorship claims.

The leading case on laches in the patent field is the Federal Circuit's en banc decision in *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed. Cir. 1992) (en banc). In that case, a patent infringement action, the Federal Circuit clarified its then-existing jurisprudence and held that laches has two elements:

> 1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and

2.  the delay operated to the prejudice or injury of the defendant.

*Id.* at 1032.  The Federal Circuit applied these rules to inventorship claims in *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157 (Fed. Cir. 1993), and held that "the period of delay is measured from when the claimant had actual notice of the claim or would have reasonably been expected to inquire about the subject matter."  *Id.* at 1161.

> Absent actual knowledge, the facts must support a duty of inquiry: The law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.

*Id.* (internal quotation marks omitted), quoting *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893).  Thus, the key question for the first prong of the laches analysis is when Apple and FlashPoint knew of, or reasonably should have been expected to inquire into, Kodak's claim to the invention of the Disputed Patents.

The second showing necessary for application of laches is material prejudice that results from the delay in bringing suit.  *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008), citing *Advanced Cardiovascular*, 988 F.2d at 1163.  Either evidentiary or economic prejudice will suffice.  *Aukerman*, 960 F.2d at 1033.

> Evidentiary, or "defense" prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.
>
> . . . Economic prejudice may arise where a defendant . . . will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.  Such damages or monetary losses are not merely those attributable to a finding of liability for infringement.  The courts must look for a change in the economic position of the [defendant] during the period of delay.

*Aukerman*, 960 F.2d at 1033 (citations omitted).  "The mere passage of time does not constitute laches."  *Advanced Cardiovascular*, 988 F.2d at 1161.

If a plaintiff delays for more than six years after the time it has inquiry notice to assert an inventorship claim, a rebuttable presumption of laches arises. "Once the presumption of laches has attached, 'the defendants [can] remain *utterly mute* on the issue of prejudice and nonetheless prevail[].'" *Serdarevic*, 532 F.3d at 1359, quoting *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1994). Nevertheless, a plaintiff can overcome the laches presumption by introducing evidence creating an issue of fact as to either element of the laches defense, *i.e.*, evidence that the delay in bringing suit was excused or otherwise reasonable, or that the defendant did not suffer prejudice. *Serdarevic*, 532 F.3d at 1359-60, citing *Aukerman*, 960 F.2d at 1038. "[A]t all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches. . . . The burden of persuasion does not shift by reason of the [plaintiff's] six-year delay." *Aukerman*, 960 F.2d at 1038-39.

"Even if unable to overcome the presumption, a patentee may be able to preclude application of the laches defense with proof that the accused . . . was itself guilty of misdeed towards the [plaintiff]. This flows from the maxim, "'He who seeks equity must do equity.'" *Aukerman*, 960 F.2d at 1038. Denying laches based on unclean hands requires a showing of "particularly egregious conduct which would change the equities significantly in plaintiff's favor" and "that the defendant's misconduct was responsible for the plaintiff's delay in bringing suit." *Serdarevic*, 532 F.3d at 1361 (citations omitted). Simple failure to name a party as an inventor on an a patent, the essential basis for an inventorship claim, does not demonstrate unclean hands. *Serdarevic*, 532 F.3d at 1362. In the end, because laches is an equitable doctrine, a court "must weigh all pertinent facts and equities in making a decision on the laches defense." *Aukerman*, 960 F.2d at 1034.

A.    **Delay in Respect of Apple's Inventorship Claims -- Laches**

Kodak makes a general argument as to all the Disputed Patents that, because Apple is a

sophisticated company with great interest in the digital imaging field, it should be charged with

constructive knowledge of all of Kodak's digital imaging patents or patent applications as soon

as they became publicly available.  This contention is overbroad, as the Federal Circuit has

cautioned that "[c]onstructive notice [through publication] is not an appropriate substitute for the

determination of reasonableness or excuse for delay."  *Advanced Cardiovascular*, 988 F.2d at

1161.  The laches clock does not start automatically upon patent issuance, since a plaintiff might

still be ignorant and have no reason to know of its claim at that time, and thus could not fairly be

said to be sleeping on its rights.  *Id.* at 1162.  On the other hand, several courts have held that the

laches period for an inventorship claim can be measured from a date even before patent issuance

under appropriate circumstances, such as where an inventor had actual notice of the patent

application.  *Hor v. Chu*, 765 F. Supp. 2d 903 (S.D. Tex. 2011); *Mahmood v. Research in

Motion*, 2012 WL 242836, 7 (S.D.N.Y. Jan. 24, 2012); *Moore v. Broadcom Corp.*, 2008 WL

425932 (N.D. Cal. Feb. 14, 2008); *Frugoli v. Fougnies*, 74 U.S.P.Q. 2d 1716, 1719 (D. Ariz.

2004); *see also Bd. of Trustees of the Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,

583 F.3d 832 (Fed. Cir. 2009) (holding that a California cause of action based on a patent can

accrue prior to patent issuance).[7]  Clearly, the date a patent is issued or a patent application is

---

[7] The *Roche* Court also rejected the argument that "a cause of action for patent ownership does not accrue
until each patent issues."  583 F.3d at 847.  The Federal Circuit distinguished *Stark v. Advanced Magnetics, Inc.*, 29
F.3d 1570, 1576 (Fed. Cir. 1994), which had been cited for the proposition that "each patent is a separate chose in
action" for purposes of inventorship, but noted that *Stark* and the cases it relied upon "did not say that if an alleged
co-owner claims ownership of an invention, and knows that a related patent application is forthcoming, its cause of
action under state law does not accrue until patent issuance."  *Id.* at 848.

published is relevant in determining when a party had actual or inquiry notice of its inventorship claim, but this date is not decisive.[8]

Far more relevant in the instant case is the principle that the public nature of patent litigation and licensing policies can put a party on inquiry notice of a patent, where reasonable inquiry would have uncovered the claims. The questions of what facts put a reasonable party on inquiry notice of its cause of action and what constitutes a reasonable inquiry were directly addressed by two Federal Circuit infringement cases involving the same inventor, *Wanless v. General Electric Co.*, 148 F.3d 1334 (Fed. Cir. 1998), and *Wanless v. Fedders Corp.*, 145 F.3d 1461 (Fed. Cir. 1998).[9] In *Wanless v. General Electric Co.*, 148 F.3d 1334 (Fed. Cir. 1998), the Federal Circuit affirmed an order of summary judgment based on laches against an owner of an air conditioner motor patent (Wanless) who had sued General Electric for infringement. The *General Electric* Court held that

> Sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement.

---

[8] Some of the cases relied on in this decision deal with infringement claims, not inventorship claims. However, as the Federal Circuit generally has applied laches jurisprudence in both areas, the Court considers infringement cases instructive and persuasive authority. It appears that the only major difference between laches in these two contexts is that, in an infringement case, "the [laches] period does not begin prior to issuance of the patent." *Aukerman*, 960 F.2d at 1032 (citations omitted). This is clearly correct with respect to infringement because a "suit cannot be brought for infringement of a patent that has not issued." *Bd. of Trustees of the Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 848 (Fed. Cir. 2009) (citation omitted). However, as just discussed, notice and accrual of an inventorship claim can occur prior to patent issuance in appropriate circumstances. *Id.*

[9] Interestingly, the same three-judge panel of the Federal Circuit decided both cases by 2-1 votes, although the majorities were different. The dissenting judge in *General Electric* took issue with "impos[ing] on Wanless—a small businessman and inventor—the costly and unreasonable burden of periodically checking and rechecking every product in this crowded market . . . ." 148 F.3d at 1341 (Rader, J., dissenting). Judge Rader then wrote a concurrence in *Fedders* to emphasize that "a patentee only has a duty to test products that the reasonable person would suspect infringe the patent." 145 F.3d at 1468 (Rader, J., concurring).

The dissenting judge in *Fedders* disagreed with the majority's holding that there were disputed or insufficient facts to define the scope of inquiry chargeable to Wanless, stating that he thought "no reasonable fact finder could conclude that it is reasonable to conduct no investigation of any type of motor for over ten years, when testing products is as easy and important as it is here," echoing language that would appear in the *General Electric* majority opinion. 145 F.3d at 1471 (Mayer, C.J., dissenting).

*General Electric*, 148 F.3d at 1338, citing *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553

(Fed. Cir. 1996).  Moreover, where the defendant's activities are "pervasive, open, and notorious

. . . constructive knowledge may be imputed to the patentee even where he has no actual

knowledge of the sales, marketing, publication, public use, or other conspicuous activities . . . ."

*Id.* at 1338.

It was undisputed that Wanlass knew that the only way to detect GE's infringement was

to dismantle and test GE's products, but he did not conduct any tests between 1970 (when he did

and found that GE was not infringing) and 1992 (when he did and found that GE was infringing);

that GE had declined to license Wanlass's patent, informing him it did not think the invention

was new or novel; and that GE engaged in the "open and notorious sale of easily testable

products." *Id.* at 1339-40.  Ultimately, the *General Electric* Court held that Wanlass should have

discovered his claims much earlier than he did through periodic testing of GE's products, stating

that, "[t]he frequency with which . . . investigations should have occurred is a function of their

cost and difficulty.  It certainly is not reasonable, however, to conduct no investigation for over

ten years, when testing products is as easy and inexpensive as it is here." *Id.* at 1340.

In *Fedders*, the Federal Circuit vacated an order granting summary judgment against

Wanlass based on laches, noting that there was minimal prior contact between the parties, that

Wanlass had created an issue of material fact as to whether Fedders was active in the air-

conditioning industry at the relevant times, that Wanlass himself was not active in the industry,

and that there was not enough evidence in the record "for the district court's implicit finding that

a program for testing all air-conditioner compressors of all makers was feasible and affordable

and otherwise a reasonable burden to impose on the patentee." *Fedders*, 145 F.3d at 1464-65.

Accordingly, the Federal Circuit remanded the case for an evidentiary hearing or until the record could support a renewed motion for summary judgment. *Id.* at 1468.

Reading *General Electric* and *Fedders* together, it is clear that "pervasive, open, and notorious" activities that would cause a reasonable patent owner to suspect possible infringement gives rise to a duty to conduct reasonable inspections of potentially infringing technology. *See also Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548 (Fed. Cir. 1996); *IBM v. Zachariades*, 70 F.3d 1278 (9th Cir. 1995), affirming in part and reversing in part 1993 WL 443409 (N.D. Cal. Oct. 27, 1993). The reasonable scope and frequency of inspection is a function of cost and difficulty.

These principles may be applied to the facts of record on the present motion for summary judgment in this inventorship dispute as follows:

> ### i.    The 335 Patent

The 335 patent is the oldest of any of the Disputed Patents, having been issued on February 20, 1996. Kodak contends that Apple had at least inquiry notice of the 335 Patent, and thus of its inventorship claims, more than six years prior to asserting the claim in March 2012 because (1) beginning in the 1990s, Apple had cited the 335 Patent as prior art no less than eleven times in its own patent applications;[10] (2) in 2004, the New York Times reported on Kodak's infringement litigation against Sony relating to digital imaging patent infringement, and (3) in 2005, Apple was served with the Sony Subpoena.

As to this patent, a determinative fact is Apple's citation of the patent in 11 of its own patent applications. In *Expert Microsystems, Inc. v. Univ. of Chicago*, 712 F. Supp. 2d 1116 (E.D. Cal. 2010), a corporation had filed an inventorship claim on behalf of its president against

---

[10] The first patent application in the record in which Apple cited the 335 Patent resulted in patent 5,867,214, and, according to USPTO records, was filed on April 11, 1996. Apple first asserted its inventorship claim to the 335 Patent on March 16, 2012, through a letter to Kodak. This is a delay of more than 15 years, which gives rise to a presumption of laches with respect to Apple's inventorship claim.

a university, which owned the patent in question.  The District Court granted the university

summary judgment on grounds of laches because the plaintiff admitted reading the front page of

each of the two patents he was now claiming to have invented, one of which expressly

referenced the process underlying his inventorship claim.  *Id.* at 1121.  The District Court held

that these facts reasonably warranted a further investigation that would have led the plaintiff to

his inventorship claim, that he had effectively represented to the USPTO that he had sufficient

knowledge of the cited patents "to conclude they constituted prior art of his invention," that he

was "on notice that the [claimed] patents may have included his invention and that it was

unreasonable for him to be unaware of their contents when he submitted" his own patent

application.  *Id.*  at 1121-22, citing *Glaxo, Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1052 (Fed. Cir.

1995).

In the instant dispute, the first page of the 335 Patent describes the invention as including

"buffer memory [that] can store a burst of low resolution images." *Ex. 1 to Holley Declaration*.

It is undisputed that Kodak and Apple discussed Apple technology in 1992 for "a 'burst' mode."

Ex. 23 to Apple's Opposition to Summary Judgment, ECF No. 22   As noted in *Expert*

*Microsystems*, Apple's lawyers effectively represented to the USPTO that they knew enough

about the 335 Patent to cite it as prior art, even if they did not cite it for the "burst mode"

technology now said to be the subject of Apple's claim.  It makes little sense to say that Apple's

lawyers knew enough about some parts of the 335 Patent to cite them in a complex patent

application, but not enough to be aware of language on the first page of the 335 Patent that

would put them on inquiry notice about Apple's claimed burst invention.

Apple's principal argument in response is that its prior art citations cannot justify

charging it with inquiry notice of the 335 Patent because the patent applications were prepared

26

by outside counsel.  However, it is well settled that a lawyer's knowledge is imputed to his or her

client under agency principles.  Cal. Civ. Code § 2332 ("As against a principal, both principal

and agent are deemed to have notice of whatever either has notice of, and ought, in good faith

and the exercise of ordinary care and diligence, to communicate to the other."); *Veal v. Geraci*,

23 F.2d 722, 725 (2d Cir. 1994).

### ii.     The 218 Patent

Apple first claimed it was an inventor of the 218 Patent in August 2010 as part of its

defenses in the ITC Proceeding and in its California Complaint.  Kodak alleges that the

following undisputed facts gave Apple at least inquiry notice of the 218 Patent many years

before: (1) it is Apple's own contention that the 1994 Presentation included possible alternatives

to camera architecture that Apple had disclosed to Kodak and that Kodak acknowledged was

owned by Apple; (2) in 1992 and 1993, Apple conducted searches of Kodak patents related to

digital imaging technology and exchanged technical information with Kodak; (3) in 1994, Apple

and Kodak entered into the Agreement for the Aspen and Phobos camera projects; and (4) Kodak

for many years engaged in open licensing and litigation relating to its digital imaging patents as

evidenced, *inter alia,* by the 2001 Analyst Report noting Kodak's aggressive patent strategy in

the digital camera field and the 2004 New York Times article discussing the Sony Litigation.

According to Kodak, this sequence of events culminated in the issuance of and Apple's response

to the Sony Subpoena in 2005.

The foregoing facts relating to the 218 Patent would have led a reasonable person to

inquire further with respect to inventorship claims.  It is undisputed that the technology on which

the 218 Patent is based, or technology so similar that Apple and Kodak are now litigating over it

in several forums, was related to the Aspen Project.  Kodak cites *Bd. of Trustees of the Leland*

*Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832 (Fed. Cir. 2009), where the Federal Circuit held on a summary judgment appeal that Roche should have known about its ownership claims based on a contract with Stanford after seeing a seeing a Stanford slide presentation in which Stanford asserted ownership of the invention at issue, offered Roche a license for it, and stated that Stanford had related patent applications pending. *Id.* at 847. Although the facts in *Roche* are stronger than those present here, Apple knew that Kodak had access to Aspen technology and that the 1994 Development Agreement between them was entered into expressly for the purpose of collaborating and developing the Aspen project. In connection with the 1994 Development Agreement, Apple undertook to uncover what digital imaging patents Kodak had at the time. Yet Apple's principal reason for wholly ignoring almost two decades of Kodak's patent activity is that it was not the industry practice of technology companies to monitor the patent activity of other companies who might be competitors or might have patents in the same sphere.[11] The Court is not implying a general duty to monitor, which Kodak itself does not assert to be industry practice. In this case, however, it is unable to accept Apple's position that a contracting party who has shared secrets with a competitor can, for almost a decade, ignore the open and notorious patent policy of its contractual counterparty without being on inquiry notice as to its rights, and that it can ignore multiple lawsuits brought by the other party against third parties, culminating in a subpoena issued by a third party (Sony) in one of these lawsuits demanding documents relating to the earlier joint endeavor. Apple's failure to investigate is plain on the facts of record of this motion.[12]

---

[11] Apple Opposition at 10-13, citing *inter alia* its own witness's affidavit and the deposition testimony of Kodak's chief IP officer, who said Kodak had no such monitoring policy in effect. (Ex. 19 to Opposition at 36:17-20).

[12] Apple's inactivity, which is otherwise inexplicable, makes perfect sense if, as Flashpoint argues, Apple assigned to Flashpoint all of the rights to the Disputed Patents.

Nor can the Court accept Apple's position that it had no reason to investigate any of Kodak's patents until Kodak actually sued Apple for patent infringement in 2010. If Apple's position were correct, and a party could not be on inquiry notice until it was actually sued in court, the principle of laches would be rendered a nullity – delay could never begin until a lawsuit had been brought.

Finally, Apple argues that it would be inequitable to apply laches to its 218 Patent claim because Kodak breached its 1994 Development Agreement with Apple and therefore has unclean hands. Kodak responds that, even if true, a breach of contract is not the type of "particularly egregious conduct which would change the equities significantly in plaintiff's favor," *Serdarevic*, 532 F.3d at 1362, and that "Apple's 'unclean hands' argument also fails because it requires an assumption that Apple would prevail on the merits." *Reply* at 25. Kodak is correct that Apple's unclean hands argument is circular—if Kodak defeats Apple's inventorship claim, then there would have been no disclosure obligation under the agreement and no unclean hands argument. "[A] good faith belief in the merits of a defense may tilt" the equities of an unclean hands finding. *Aukerman*, 960 F.2d at 1033. On the whole, the equities favor Kodak on the 218 Patent.

### iii.    The 391 Patent, 084 Patent, 605 Patent, 161 Patent, 342 Patent, 854 Patent, 703 Patent, and 406 Patent

Apple first asserted its inventorship claims as to the 391 Patent, 084 Patent, 605 Patent, 161 Patent, 342 Patent, 854 Patent, 703 Patent, and 406 Patent (the "Miscellaneous Patents") on March 16, 2012, through a letter to Kodak's bankruptcy counsel. Kodak argues that Apple (and FlashPoint) should have been put on at least inquiry notice of their claims more than six years before (March 16, 2006) because of the fact that: (1) public information was available about

29

these patents through issuance, application publication, parent patent issuance, or continuation of applications; (2) Kodak's licensing and litigation efforts relating to its digital imaging patents; and (3) the fact that all of the patents are related and in the digital imaging field.

The instant record does not reveal sufficient facts beyond the publication of these patents (or their applications) to support a finding that Apple had reason to know about them, and there is insufficient evidence on this record to charge Apple with constructive knowledge of its inventorship claims or a duty of inquiry.  It is undisputed that Kodak engaged in "pervasive, open, and notorious" licensing and litigation activities relating to its digital imaging patents, and the Court has found that Apple had a duty to inquire into Kodak's activities with respect to the 218 and 335 Patents.  Still, the record does not demonstrate that Apple had any particular reason to take notice of the Miscellaneous Patents based on the publicized accounts of Kodak's strategy. It is alleged that several of the patents are extensions or divisions of prior applications, but the effect of this on Apple's duty to investigate is not made clear on the record. For example, Kodak argues that the Sony Litigation involved two parent patents that relate to four of the Miscellaneous Patents, but there are insufficient facts in the record connecting any of the camera projects named in the Sony Subpoena to the Miscellaneous Patents.  In addition, some of the patents were issued within six years of 2012.

Taking all inferences in Apple's favor, it cannot be found on the instant record that Apple knew or should have known after a reasonable inquiry of its inventorship in the Miscellaneous Patents, and Kodak's motion for summary judgment based on laches is denied as to these patents, without prejudice to renewal on a more complete record.

### iv.     Prejudice Resulting from Delay

In addition to unreasonable delay, a party relying on the doctrine of laches must also suffer prejudice as a consequence of the delay.  Since Kodak, on the present record, has shown unreasonable delay by Apple only with respect to the 335 and 218 Patents, the question of delay will be considered only with respect to those two patents.

Prejudice may be of an economic or evidentiary nature.  Kodak principally argues that it has been economically prejudiced by Apple's tardy inventorship claims due to the fact that it is in bankruptcy and is seeking to sell the very patents Apple contests.  Apple responds that Kodak cannot prove economic prejudice because it has actually profited by its ability to exploit the Disputed Patents during the period of delay asserted.

In the first instance, Apple's assertion that Kodak has not been harmed and actually benefitted from its delay in bringing suit has been rejected by the courts.  "Financial success alone does not evidence a lack of economic prejudice."  *Mahmood v. Research in Motion Ltd.*, 2012 WL 1801693, *6 (S.D.N.Y. May 16, 2012); *see also ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386 (E.D. Wisc. 1993), *aff'd* 52 F.3d 1062 (Fed. Cir. 1995); *Coleman v. Corning Glass Works*, 619 F. Supp. 950 (W.D.N.Y. 1985), *aff'd* 818 F.2d 874 (Fed. Cir 1987).

As to real economic prejudice, Kodak is now in a chapter 11 reorganization proceeding fighting for its economic survival.  It is required by its debtor-in-possession financing agreement to monetize its patent portfolio by selling its patents pursuant to Bankruptcy Code § 363.  Apple has objected to Kodak's plans to sell these patents at every stage of the case, and although the Court rejected certain of Apple's contentions, *Kodak*, 2012 WL 2255719, at *3, Kodak would still be prejudiced if Apple could argue that its "inventorship rights" in the 218 and 335 Patents

cannot be adequately protected if Kodak ultimately sells the 218 and 335 Patents.  *See* 11 U.S.C. § 363(e), (f)(4).  A chapter 11 debtor faces enormous pressures while attempting to reorganize, and Kodak's ability to effect a critical sale of property of the estate while protecting other parties' interests in that property would be cut off if Apple's unreasonably late claims are not barred.

Apple cites *Advanced Cardiovascular*, 988 F.2d at 1163, for the proposition that "the prejudice element of laches is not established solely because the raising of the claim would delay other litigation."  The prejudice that would accrue to Kodak, however, is not simply delay in the sale process.  The record establishes that the 218 and 225 Patents are important and perhaps critical pieces of Kodak's digital imaging patent portfolio.  If Apple's claims proceed despite their unreasonably delayed commencement, Kodak might have to go back to the drawing board for ways to fund its case.  If Apple had brought its claims sooner, Kodak's chapter 11 strategy at the least could have been modified to account for the cloud on title of the 218 and 355 Patents. This is an adequate ground for economic prejudice.

With respect to evidentiary prejudice, Kodak reasonably claims that it will need to locate and secure the participation of the inventors for the Disputed Patents, including Kenneth A. Parulski, a named inventor of both the 218 and 335 Patent.  Mr. Parulski has retired from Kodak, and he has no ongoing consulting agreement that would ensure his availability.  Apple argues that Kodak cannot show evidentiary prejudice because "Mr. Parulski, together with two other named inventors, is currently being represented by counsel for Kodak in other patent infringement litigation brought by Kodak," and Kodak has not identified witnesses unable to testify.  *Memo in Opposition* at 23-24, citing *Mahmood*, 2012 WL 242836 at *8.  Nevertheless, the possible availability of a key witness does not overcome the fact that memories undoubtedly

fade about the relevant events when there is a two decade delay in pursuing rights.  *See Hor v.*

*Chu*, 765 F. Supp. 2d 903, 919-20 (S.D. Tex. 2011) (finding evidentiary prejudice after two

decade delay, the death of a key witness, and parties' fading memories).  Courts in fact find that

the passage of less time causes prejudice to a party to litigation.  John G. Mills, Donald C. Reiley

III, and Robert C. Highley, 6 *Patent Law Fundamentals* § 20:45 (citing cases).  Based on the

record, Kodak has suffered evidentiary prejudice in its ability to defend against Apple's

inventorship claims for the 218 and 335 Patents as a result of Apple's decades-long delay in

bringing suit.

**B.      FlashPoint's Inventorship Claims**

Much of the above discussion relating to Apple's claims is applicable to FlashPoint.

However, the following factual differences between the two defendants must be taken into

account.

First, as Flashpoint contends, the 1997 Licensing Agreement between Kodak and

FlashPoint contained a broadly worded covenant by Kodak not to sue FlashPoint for

infringement of any patents that Kodak then held or later obtained during the term of the

contract.  (Ex. C to Fry Declaration at §§ 9.1-9.2.)  Although this is tantamount to Kodak's

having granted FlashPoint a license in such patents, the covenant not to sue is not a defense to

Kodak's laches argument because it relates only to infringement disputes with FlashPoint, not

disputes based on inventorship.

Second, FlashPoint points out that even though the spinoff resulted in the assignment by

Apple to FlashPoint of large parts, if not all, of Apple's digital imaging business, including

patent rights, FlashPoint as a corporate entity has never even received a copy of the 1994

Development Agreement between Kodak and Apple.  It is uncontested that FlashPoint's outside

counsel recently received a copy but is not permitted to share it with FlashPoint pursuant to a

confidentiality agreement.  On the other hand, if FlashPoint has any inventorship claims relating

to the 1994 Apple-Kodak Development Agreement, they derive from Apple's rights exclusively,

and are subject to all of the infirmities of Apple's claims.  An assignee gets no better rights than

an assignor. *Whitely v. Swayne*, 74 U.S. 685 (1868); *Taylor-Reed Corp. v. Mennen Food

Products, Inc.,* 324 F.2d 108 (7th Cir. 1963).

Third, Kodak and FlashPoint entered into several development and licensing agreements

from 1997 until 2003 with respect to digital software.  Flashpoint vaguely asserts that these

agreements, as well was Kodak's retention of FlashPoint's president and CEO, Stan Fry, as a

consultant on Kodak's IP licensing strategy somehow equitably tolled the passage of time on

FlashPoint's inventorship claims. Flashpoint does no more, however, than invoke the "doctrine of

equitable tolling" (FlashPoint's Opposition at 3) without further explanation or citation of

authority.  It is hard to see how the relationship between the parties in connection with digital

camera technology reduced FlashPoint's duty to investigate Kodak's repeated claims to be the

sole owner of multiple patents. Although it is not contended that Fry reviewed specific patents or

patent applications while so retained, there was obviously a close relationship between the two

companies.

Finally, Kodak and FlashPoint entered into a standstill agreement that tolled time-related

defenses that might apply to FlashPoint's claims.  The tolling period began on September 21,

2010, and it is uncontested that it continued through March 8, 2011.  Kodak asserts that it never

agreed to extend the standstill past this date, while FlashPoint argues that the agreement only

terminated when Kodak commenced its bankruptcy case on January 19, 2012.  Given the

discussion below, however, the duration of the standstill period would not change the Court's

determination of the issues and is thus immaterial on this motion.

i.        The 391 Patent, 084 Patent, 605 Patent, 161 Patent, 342 Patent, 743 Patent,

192 Patent, and 444 Patent

Inventorship of the first five of these patents is also claimed by Apple, and Flashpoint

first asserted its inventorship claims as to these at a hearing in this Court on June 13, 2012.

The three remaining Additional Disputed Patents, as to which Flashpoint alone asserts

inventorship, were first made the subject of dispute later, in filings with the Court.  The first time

formal claims were made was June 25, 2012, when FlashPoint's answer and counterclaims were

filed on the Bankruptcy Court's docket.

Kodak argues that FlashPoint had inquiry notice of its inventorship claims more than six

years before asserting them due to (i) constructive knowledge of the patent applications and/or

issuance, (ii) the 2001 Analyst Report, (iii) the Sony Subpoena, (iv) the 2004 New York Times

article describing the Sony Litigation, and (v) Fry's retention as a consultant.

As discussed above, however, "[c]onstructive notice [through publication] is not an

appropriate substitute for the determination of reasonableness or excuse for delay." *Advanced

Cardiovascular*, 988 F.2d at 1161. As with Apple, Kodak must point to other facts in addition to

the fact of patent filing in order establish that a reasonable person would inquire further into the

patents.  None of the evidence offered by Kodak names these eight patents, and Kodak has not

shown that a reasonably cost-effective search would have led FlashPoint to these eight patents

based on a general awareness that Kodak was licensing and litigating its digital camera patents.

Kodak claims that some of the patents are divisions or continuations of earlier applications, but it

fails to meet its burden of establishing sufficient facts on this motion.  Moreover, five of these

35

patents (391, 084, 605, 161 and 444) did not issue even six years before Flashpoint first raised its

inventorship claims, and a presumption of laches does not arise.

On the other hand, there is no basis for FlashPoint's contention that its relationship with

Kodak, including the two 1997 Agreements and the 2003 Agreement and the Fry consulting

agreement, somehow equitably tolls its duty to investigate Kodak's claims to the inventorship of

numerous patents in the area in which the parties were collaborating. If anything the

collaboration and the respective cross-licenses and agreements not to sue for infringement made

it more likely that the parties would keep abreast of what the other party was doing in the area of

joint interest.  It is well accepted, for example, that a joint venturer cannot claim ignorance of

what his partner was openly doing for many years if there is a subsequent dispute between them.

*Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n.4 (2d Cir. 1983).

### ii.       The 335 Patent, 218 Patent, 854 Patent, 703 Patent, and 406 Patent

FlashPoint informally asserted its inventorship claims as to the 218 Patent at a March 8,

2012 hearing, and the other four patents in this group were not claimed until the June 13, 2012

hearing.  FlashPoint did not sue on these claims until June 25, 2012.

There is undisputed evidence in the record that FlashPoint cited these eight patents as

prior art in its own patent applications.  According to USPTO records, the first citation of the 335

Patent was in the FlashPoint application resulting in patent 6,177,956 on October 23, 1996; of

the 406 Patent in the application resulting in patent 6,249,316 on August 23, 1996; and of the

218 Patent, 703 Patent, and 854 Patent in the application resulting in patent 8,102,457 on

December 15, 1998.  As noted above with respect to Apple's prior art citations of the 335 Patent,

such an action is ordinarily sufficient to place a reasonable person on inquiry notice of

inventorship claims for the patents cited.  All of these dates are well before FlashPoint filed its

36

claims against these patents, even taking into account the standstill period, and a presumption of laches arises with respect to each one. For the same reasons as stated above with respect to Apple, Kodak is entitled to summary judgment on the issue of laches regarding these patents, and it has adequately shown prejudice.

## III.    State Law Claims

Kodak also seeks summary judgment that Apple's and FlashPoint's state law causes of action are barred by applicable statutes of limitations, the longest of which is four years.[13] A critical inquiry to any statute of limitations determination is when the limitations period starts to run. Under California law, "[g]enerally, a plaintiff must file suit within a designated period after the cause of action *accrues*." *Poosh v. Philip Morris USA, Inc.*, 250 P.3d 181, 187 (Cal. 2011), citing Cal. Civ. Proc. §312. A cause of action accrues under California law "when [it] is complete with all of its elements." *Id.*, quoting *Norgart v. Upjohn Co.*, 981 P.2d 79, 88 (Cal. 1999). Under California law, a cause of action is asserted for statute of limitations purposes "when a complaint is filed." Cal. Civ. Proc. Code § 350. A party relying on the discovery rule (discussed below) "must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 110 P.3d at 921 (citation omitted).

An important exception to the general accrual rule is the California "discovery rule," which "postpones accrual . . . until the plaintiff discovers, or has reason to discover, the cause of action." *Nogart*, 981 P.2d at 88 (citations omitted). "A plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements." *Fox v.*

---

[13] Cal. Civ. Proc. Code § 337(1) (four year limitations period for breach of contract claim); *id.* § 338(c) (three year limitations period for conversion claims); Cal. Bus. & Prof. Code § 17208; (four year limitations period for unfair competition, unfair and/or deceptive business acts and unlawful business acts); Cal. Civ. Proc. Code § 339(1) (two year limitations period for breach of confidence).

*Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 919 (Cal. 2005) (citations and internal quotation

marks omitted).  "Rather than examining whether the plaintiffs suspect facts supporting each

specific legal element of a particular cause of action, [California courts] look[] to whether the

plaintiffs have reason to at least suspect that a type of wrongdoing has injured them."  *Id.* at 920.

Once a plaintiff has reason to suspect an injury, he is "required to conduct a reasonable

investigation . . . and [is] charged with knowledge of the information that would have been

revealed by such an investigation."  *Id.*  Therefore, the critical inquiry for accrual is the same as

for the laches analysis above: when did Apple and FlashPoint know, or when should they have

known after a reasonable inquiry, of their state law claims.[14]

Regarding Apple, the conclusions with respect to its state law "ownership" claims are the

same as with its inventorship claims, taking into account the shorter limitation periods.   With

respect to the 335 and 218 Patents, the Court has found that Apple slept on its rights for at least

six years, longer than any of the California limitations periods.  The "ownership" claims are

accordingly untimely under applicable state law.  With respect to the remaining patents, as

discussed above, Apple states that it began its investigation when Kodak brought suit in the ITC

and the Western District of New York in 2010 and first sued on its claims in the counterclaims

filed in this adversary proceeding.[15]  As also discussed, Kodak has not established on this record

an earlier accrual date for these patents, and none of the claims would be untimely under the

California statute of limitations.

FlashPoint's state law claims should also be dealt with in the same fashion as their

federal inventorship claims.  Thus, in the chart below, for Flashpoint, the June 25, 2012 "Date

---

[14] Unlike the laches analysis, Kodak can prevail on the statute of limitations argument without a showing of prejudice.
[15] Under California law, a cause of action is asserted for statute of limitations purposes "when a complaint is filed."  Cal. Civ. Proc. Code § 350.

38

Asserted" is the date of its counterclaims in this adversary proceeding.  The "Date Accrued" for the first five patents is the date on which FlashPoint first referred to the Kodak patent as prior art in one of its patent applications.  FlashPoint's state law claims are untimely with respect to these patents.  For the remaining patents, Kodak has failed either to provide facts to demonstrate that FlashPoint had a duty to investigate the cause of action at an earlier time, or the patent issued so recently that none of the limitations periods had expired.  In either case Kodak is not entitled to an order of summary judgment on this record.

**FlashPoint's State Law Claims**[16]

| **Patent** | **Date Accrued** | **Date Asserted** | **Breach of Contract** | **Unfair Competition & Unlawful or Deceptive Business Acts** | **Conversion** | **Breach of Confidence** |
|---|---|---|---|---|---|---|
| 406 Patent | August 23, 1996 | June 25, 2012 | Barred | Barred | Barred | Barred |
| 335 Patent | October 23, 1996 | June 25, 2012 | Barred | Barred | Barred | Barred |
| 218 Patent | December 15, 1998 | June 25, 2012 | Barred | Barred | Barred | Barred |
| 703 Patent | December 15, 1998 | June 25, 2012 | Barred | Barred | Barred | Barred |
| 854 Patent | December 15, 1998 | June 25, 2012 | Barred | Barred | Barred | Barred |

**Conclusion**

For the reasons set forth above, Kodak's motion for summary judgment is granted in part and denied in part, without prejudice to renewal on a more complete record.  Kodak's counsel

---

[16] The 444 Patent issued on March 24, 2009, and Kodak conceded at oral argument that FlashPoint's state law causes of action are not time barred by applicable statutes of limitation.

39

shall settle an order on three days' notice.  In connection with the settlement of an order, the

parties should also state their positions as to whether this Court can enter an order of summary

judgment or must file findings of fact and conclusions of law for District Court entry.  In prior

papers on this motion, Apple and Flashpoint have taken the position that this Court must file

proposed findings and conclusions in light of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), but their

positions were taken before they filed proofs of claim against the Debtors that in substance

incorporate their counterclaims in these proceedings. This new development should be taken into

account.


Dated:   New York, New York
         August 1, 2012


                                         */s/ Allan L. Gropper*_____
                                         UNITED STATES BANKRUPTCY JUDGE